**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>ex rel. DWAYNE LANCASTER,<br>personal representative of the Estate of<br>Teresa Lancaster, Deceased,<br><br>           Plaintiffs,<br><br>v.<br><br>THE BOEING COMPANY,<br><br>           Defendant. | )<br>)<br>)<br>)<br>)    Case No. 03-CV-810-GKF-PJC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

This action was brought pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729 et

seq., by Dwayne Lancaster, the personal representative of the estate of his deceased wife, Teresa

Lancaster, on behalf of the United States and against her former employer, The Boeing Company

("Boeing"). Before the Court is Boeing's Motion for Summary Judgment for Lack of Jurisdiction

[#138].

Boeing is the world's largest manufacturer of commercial jets, and provides support for

many of the aircraft it manufactures, including four Boeing-747-200B aircraft that have been

modified for military application and use by the United States Air Force in its "E-4 Advanced

Airborne Command." Boeing provides "Contractor Logistics Support" ("CLS") to the Air Force

for the aircraft in the E-4 Program, acting essentially as the purchasing agent for the Air Force in

obtaining repair and replacement parts for the aircraft.

Teresa Lancaster was an employee at Boeing's facility in Oklahoma City from February

1996 to September 12, 2002. In her job, she had oversight duties over certain military programs

at the facility, including the E-4 Program. After resigning from Boeing, she brought this action

under the FCA, alleging that Boeing had submitted false claims to the Air Force in connection with the E-4 Program. Specifically, she alleged that the CLS contract generally requires Boeing to use only FAA-certified parts in modifying and maintaining aircraft in the E-4 Program. She asserted Boeing breached this requirement and falsely represented to the government that the parts Boeing provided were in full compliance with the contract. Following her death in 2004, her husband was appointed as the personal representative of her estate and substituted as the Relator in this action.

In its motion for summary judgment, Boeing asserts the court lacks subject matter jurisdiction over the Relator's claims because the Relator cannot establish Teresa Lancaster was the "original source of the information" regarding alleged fraud, as required by 31 U.S.C. §3730(e)(4)(A). The Relator contends §3730(e)(4)(A) does not bar him from proceeding because there had been no "public disclosure" of information at the time the action was filed, his claim was not based upon allegations made in an earlier investigation, and Teresa Lancaster qualified as an "original source" of the information upon which the complaint was based.

## I. Material Facts

1. In the 1970s, the Air Force purchased four commercial Boeing-747-200B aircraft that were modified for military application and use by the Air Force in its "E-4 Advanced Airborne Command." [#138, Defendant's Statement of Undisputed Material Facts, ¶1; #160, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶1]. The Air Force contracted with Boeing to provide "Contractor Logistics Support" ("CLS") for the E-4 Program. Under the CLS contract, Boeing essentially acts as a purchasing agent for the Air Force in obtaining repair and replacement parts for the aircraft in that program. [*Id.*]. Additionally, Boeing is to insure that

repair/replacement parts met contract specifications, including FAA certification. [#160, Plaintiff's Response, ¶1 and Exs. 3 and 3A].

2. Teresa Lancaster was an employee at Boeing's facility in Oklahoma City from February 1996 to September 2002. Beginning in or around December 1999, she worked in Boeing's Procurement Quality Assurance ("PQA") Department with responsibilities including the E-4 Program. [#138, Defendant's Statement of Facts; #160, Plaintiff's Response].

3. After resigning from Boeing in September 2002, Ms. Lancaster filed this action on November 26, 2003 [#1, Complaint].[1] Pursuant to the FCA, the matter was sealed while the United States made a determination whether to intervene in the action. [#9]. On April 21, 2004, Ms. Lancaster died and her husband subsequently was appointed as the personal representative of her estate. [#81, 2nd Amended Complaint, ¶7]. On September 1, 2006, Relator filed an Amended Complaint. [#29]. On March 14, 2007, the United States declined intervention. [#45]. The court ordered the case unsealed on April 25, 2007. [#48].

4. On February 14, 2008, the court granted Boeing's Motion to Dismiss Count One of the Amended Complaint for Failure to Plead Fraud with Particularity. [#78]. The court granted plaintiff's Motion to Amend [#79], and on July 31, 2008, plaintiff filed his Second Amended Complaint (the "Complaint"). [#81].

---

[1]Plaintiff has claimed Teresa Lancaster was constructively discharged [#81, 2nd Amended Complaint, at ¶¶79-89], presumably in violation of 31 U.S. §3730(h), which permits relief for any employee discharged or otherwise discriminated against because of her *qui tam* action. Boeing has moved only for summary judgment on the *qui tam* claim. The Tenth Circuit has stated, "the case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful or even filed." *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1522 (10th Cir. 1996). Therefore, the court must consider Boeing's motion as one for partial summary judgment.

**Allegations of the Complaint**

5. In the Complaint, Relator alleges that the CLS contract between Boeing and the Air Force relating to the E-4 Program "requires that, with very few exceptions, modifications and maintenance...be performed using FAA certified parts." [*Id.,* ¶22]. Relator asserts that under the contract, all parts, repairs and overhauls of the E-4 aircraft were required to meet FAA requirements, parts were to be replaced with qualitatively equivalent parts, maintenance records were required to be documented using certain specified forms and certain safety and quality assurance standards were required to be met by Boeing. [*Id.,* ¶25.] Relator contends:

> 26. Boeing has continually breached these provisions of the Contract while continually representing to the Air Force that the parts Boeing has submitted have met these requirements. Boeing has used non-FAA compliant parts in tens of thousands of repairs, has used inferior and dangerous parts for repair of the E-4 Aircraft, has failed to keep proper maintenance records, and has created an alleged system of safety and quality assurance standards which, in reality, allows Boeing to circumvent any true standard of safety.
>
> 27. Boeing has continually and falsely represented to the federal government with the submission of these parts, that the parts have met the appropriate standards of law, safety and the Contract. Boeing has intentionally and willfully concealed the truth from the Air Force.

[*Id.,* ¶¶26-27]. In Paragraphs 29-48 of the Complaint, the Relator describes the system by which Boeing allegedly carried out its purported plan to substitute "inferior and less expensive parts" for the FAA approved parts that Relator contends are required under the contract. The Complaint asserts that "[t]hese parts are then passed on to the Air Force as if they were fully compliant, FAA certified parts." [*Id.,* ¶47]. Relator contends that "[f]or at least the past ten years, Boeing has engaged in a pattern and practice of fraudulently submitting claims to the Air Force which represent that repairs and replacement of parts on the E-4 Aircraft have been compliant with the Contract and with FAA certifications." [*Id.,* ¶48].

4

## CLS Contract

6. In October 1986, the Air Force awarded Boeing a $20 million per year contract to perform depot maintenance and spares support on the four E-4 aircraft. [#138, Defendant's Statement of Facts, ¶9 and Ex. 3, Draft Report at AFOSI 000355; #160, Plaintiff's Response, ¶9 and Exs. 3 and 3A]. The contract number was F34601-86-0953. [#138, Ex. 3 at AFOSI 000355]. (The contract is also referred to as the "CLS contract," the "base contract" and the "E-4 Program Contract.")

## Repair of Fire Damaged Aircraft

7. On December 30, 1991, a ground fire caused $2.2 million in damages to one of the aircraft in the E-4 Program. Boeing began the repairs on the fire-damaged aircraft in early 1992 at Offutt Air Force Base ("Offutt") in Nebraska. [#138, Defendant's Statement of Facts, ¶10 and Ex. 3, Draft Report at AFOSI 000355; #160, Plaintiff's Response, ¶10]. At the conclusion of the repair project, Boeing submitted a Certificate of Completion in which it stated that "all effort associated with Invoice 92AE069, dated 12/21/92 accomplished under CLIN[2]4010, Contract F34601-86-C-0953, Option 4" had been completed in accordance with the Statement of Work and certified that "the supplies or services are of the quality specified and conform in all respect with the contract requirements." [#168, Defendant's Supplement to Reply Brief, Ex. 2].

## Investigation Into Repairs of Fire-Damaged Aircraft

8. In September 1992, the Air Force Office of Special Investigations ("OSI") initiated an investigation into Boeing's repairs of the fire-damaged E-4 aircraft. [#138, Defendant's Statement

---

[2]CLIN stands for Contract Line Item Number, an addendum to the contract for repairs on the fire-damaged aircraft.

of Facts, ¶11 and Ex. 4, Report of Investigation dated March 4, 1994 ("Report") at AFOSI 000003-6]; #160, Plaintiff's Response, ¶11]. The Department of Defense Inspector General's ("IG") office later joined the investigation. [#138, Defendant's Statement of Facts, ¶11 and Ex. 5, Significant Incident Report, April 10, 1994, at AFOSI 000617-18]; #160, Plaintiff's Response, ¶11]. The investigation was based on information received from an unnamed Boeing employee who told the Air Force that Boeing had installed parts on the aircraft without complying with the quality assurance ("QA") process. [#138, Defendant's Statement of Facts, ¶11 and Ex. 4, Report at 1; #160, Plaintiff's Response, ¶11].

9. According to the Report, the informant told the Air Force that Boeing had failed to conduct QA inspections of replacement parts placed on the aircraft by Boeing and that many of those parts did not have authentic Certificates of Compliance (COCs). [*Id.* at AFOSI 000003]. Darlene Holseth, the lead investigator for the OSI, described the informant's allegations as follows:

> Some [of the COCs] were not signed by the manufacturer; some had rubber stamped signatures; some were copied, signed COCs with the part and quantity changed; and some looked like they were cut and pasted together. [The informant] also said some parts were installed on the aircraft which had not received any QA at all.

[*Id.*]. In its investigation, the OSI seized documents from Boeing which, according to Holseth, substantiated the informant's allegations. [*Id.*].

10. The Report stated that interviews of 11 Boeing employees who had been given immunity "disclosed that they have had problems with QA for years, which had been continually upchanneled to the Boeing Defense and Space Group well before the repairs of the aircraft." [*Id.* at AFOSI 000003-4]. The Report stated:

A contract file review was completed, which showed the QA requirements for this contract (contract number F34601-86-0953); Boeing was to either have inspection at the source of the parts, or they were to receive a manufacturers COC stating the part conforms to all specifications. The manufacturers COC is to be from the manufacturer and signed by the manufacturer.

[*Id.* at AFOSI 000004].

11. The OSI examined whether Boeing had violated a number of federal statutes, including whether it had submitted a false claim to the Air Force in violation of the False Claims Act, 31 U.S.C. §3729. [#138, Defendant's Statement of Fact ¶13 and Ex. 4, Report at AFOSI 000001; #160, Plaintiff's Response, ¶13].

12. During the course of its investigation, the OSI interviewed at least 26 individuals over a 15-month period. Of these witnesses, only seven were identified by investigators as possible participants in the alleged wrongdoing. [#138, Defendant's Statement of Fact, ¶14 and Ex. 4, Report at AFOSI 000006 and Ex. 3, Synopsis, at AFOSI -000355; #160, Plaintiff's Response, ¶14].

13. A number of the individuals who were interviewed were employees of the companies who made the parts that were installed by Boeing on the subject aircraft. Some of these individuals stated that the COCs "looked falsified, most did not sell to [Boeing] or Pride Electronics (the distributor) the parts in question, and those who did sell the parts, said no one asked for a COC, and therefore they did not provide one." [#138, Defendant's Statement of Fact ¶15 and Ex. 4, Report at AFOSI 000003, and Ex. 5, Significant Incident Report at AFOSI 000617].

14. Lisa Vanis, a former Pride Electronics employee, was interviewed on August 26, 1993, by an AFOSI detective. At her request, Nicholas Russo, who was her manager first at Pride

and subsequently at Spectrum Electronics, attended the interview. Vanis and Russo told the detective that while they were at Pride, it had two types of COCs–a manufacturer's COC and Pride's own COCs. If Boeing wanted a manufacturer's COC, that would be noted on Pride's order voucher. If a manufacturer's COC could not be obtained, Pride would notify Boeing and it could cancel the order, if a Pride COC, as opposed to a manufacturer's COC, was not acceptable. Vanis recalled being asked by Boeing personnel for manufacturers' COCs after parts were delivered to it in the Feb./March 1992 time frame. She said this was the first time Boeing had asked for manufacturers' COCs and she told Boeing personnel she could not supply them. She recalled someone at Boeing telling her that they were having "some type of internal problems or investigation, and needed manufacturers COCs." She said after she told the Boeing personnel she couldn't supply manufacturers' COCs, Boeing did not order anything else from Pride while she worked there. [#138, Defendant's Statement of Facts, ¶16 and Ex. 6, AFOSI 000060-61]. However, *after* that interview, on August 26, 1993, Vanis telephoned the investigator and asked to speak to him without Russo present. [#160, Ex. 10 at AF-FOIA 0830]. Vanis and the detective met, and she told him that an individual with Boeing named "Dick" had asked her for the manufacturers' COCs in the Feb/March 1992 time frame. [*Id.*]. She told him she couldn't supply them and that if the parts were not satisfactory, he should return them to Pride for a refund. [*Id.*]. He told her it was "too late" (she took this to mean the parts had already been installed and could not be removed). [*Id.*]. Dick started calling her almost daily asking for the manufacturers COCs, saying he could lose his job if he didn't get them and eventually telling her to "do whatever you have to do, but get me the COCs." [*Id.*]. As a result of his badgering, she created COCs from the manufacturers that supplied the parts to Pride, and sent them to Dick. [*Id.*].

15. An undated document titled "Boeing Investigation" states that during the investigation, a federal search warrant was executed on the Boeing field unit on Offutt Air Force Base and documents were seized, including COCs, vouchers, bills of lading, contract documentation and griefs (documentation of problems with parts arriving at Offutt). [#138, Defendant's Statement of Fact ¶17 and Ex. 7, Boeing Investigation, AFOSI 000370, ¶2]. The document stated, "Initial review of seized documents disclosed 55 pages of parts installed on the aircraft, and at that time it was unknown which were under question." [*Id.,* ¶3]. The investigator, Holseth, was able to narrow the suspected parts list down to two pages. [*Id.,* ¶4]. The document stated, "A contract file review was completed on the E-4B contract which disclosed Boeing is to use authorized vendors for purchasing parts. If Boeing goes outside these vendors, they are to receive a COC from the manufacturer stating the parts comply with all specifications." [*Id.,* ¶5].

16. An AFOSI Report of Investigative Activity covering the period of November 2, 1992 to February 8, 1993, stated a review of the COCs disclosed 70 items either did not have correct COCs or did not have COCs at all. [#138, Ex. 8, Report of Investigative Activity, AFOSI 000165-67]. The report listed the parts with missing or incorrect COCs and also listed parts as to which no QA had occurred. [*Id.*].

17. An AFOSI Report of Investigative Activity for April 5, 1993 detailed the results of Holseth's interviews with an administrative contract administrator (Jerry Singleton) and an administrative contracting officer (Dan Wolfinger) about repairs to the fire damaged aircraft. [#160, Ex. 6, AF-FOIA 0795]. Singleton and Wolfinger told Holseth that normally the Defense Contracting Management Office handles QA, but since the repairs were done on an Air Force installation, the QA had to be performed by the USAF. Lt. Col. Paul Yeoman, who was stationed

at Offutt Air Force Base, served as the QA representative. Neither Singleton nor Wolfinger sent any guidelines to Yeoman, and assumed the Procuring Contracting Officer did. They were unaware of any agreement to limit the amount of QA performed on the aircraft. They were also unaware of any type of delivery schedule for completion of repairs, but did receive many calls for them to complete the contract. On April 6, 1993, Singleton provided a copy of the Amendment of Solicitation/Modification of Contract, which "doesn't say anything about changing the QA requirements from the basic contract." [*Id.*].

18. In an undated memorandum, Holseth stated:

We are concentrating on four areas of criminality in this case.

1. When the COCs were originally falsified (apparently a Boeing employee pressured a Pride employee into falsifying them three times).

2. After the search, another Boeing employee from Oklahoma City called two Boeing employees here, and asked them to destroy documents we had not gotten during our search, which they did.

3. After the plane was grounded, another Boeing employee certified that they had all the certificates but one. When many were missing, the falsified ones had been replaced, and they knew it.

4. The false claim filed in December 1992.

We are not talking about a mistake anymore. If Boeing had told us when they found out about the problems when they did their internal investigation, then this investigation would not have been done. There would have been a problem with item 1 above, but Boeing could have handled that internally. However, instead they didn't tell anyone in the USAF (that I can find), they tried to cover it up, they lied about it, and they filed the claim. I do not see this as a mistake anymore. Also, this has been going on for longer than the repairs, it has been going on for years. Boeing's own quality assurance inspector has been telling Boeing in Oklahoma City about the problems for years, they just decided to ignore it.

[Hearing Ex. 1, AFOSI 000364].

19.   Within one week of receiving the information regarding Boeing's alleged misconduct, the OSI briefed an Assistant United States Attorney for the District of Nebraska on the matter. [#138, Defendant's Statement of Fact ¶18 and Ex. 9, Johnson Memo dated 3/23/92, AFOSI 001080].  Based on this briefing, United States Attorney Thomas Monaghan commenced an investigation in October 1992. [#138, Defendant's Statement of Fact ¶18 and Ex. 10, Letter from Monaghan to Burke dated 2/6/96].  Monaghan's office explored the possibility of both civil and criminal prosecutions of Boeing and its employees. [*Id.*].

20.   Early in the U.S. Attorney's investigation, Holseth wrote a letter to Assistant U.S. Attorney Robert Kokrda summarizing the results of the OSI investigation to date.  The letter stated:

> This investigation was initiated based on information from CI [Confidential Information] that Boeing failed to perform quality assurance on parts put into a damaged E-4b aircraft.  CI said that there were items which had no Certificates of Conformance (from vendors other than Boeing) (Compliance with FAA standards), and there were no flammability certificates on the insulation or tests of the wiring which were put into the aircraft.....CI also claimed the only quality assurance done on most parts was to check the part number on the box with the part number ordered....
> *   *   *
> The search of Boeing on Offutt AFB was mainly for the bills of lading, certificates of conformance, and other documented evidence, along with contracts regarding the fixing of the damaged E-4b aircraft.
>
> Results of the search have been preliminarily assessed: The information provided by both sources appear to be true and correct.  The quality assurance stamps which are supposed to be on the bills of lading are not present on all of them.  Also, there are no Certificates of Conformance for all parts which require them.  And there were no flammability certificates found, and only one test of the wiring.

[#138, Defendant's Statement of Fact ¶19 and Ex. 11, Memo From Holseth to Kokrda dated 10/5/92].

21. On March 19, 1993, the OSI gave an AUSA a "classified briefing and tour of the damaged aircraft," which "provided the AUSA with a much better understanding of the potential and actual mission impact as it relates to the allegations." [#138, Defendant's Statement of Fact ¶20 and Ex. 9, Johnson Memo at AFOSI 001080).

22. Between late 1992 and early 1996, the U.S. Attorney's office corresponded numerous times with members of the OSI and the Air Force regarding the ongoing investigation. [#138, Defendant's Statement of Fact ¶21 and Ex. 12, Letter from Madgett to Henderson dated 1/13/95; Ex. 13, Letter from Madgett to Henderson dated 2/15/95; Ex. 14, Memo from Watkins to Madgett dated 2/28/95; Ex. 15, Memo to File by Senness dated 3/1/95).

23. On December 29, 1993, Bill McDaniels, Acting Chief of Aircraft Contracting Division, Directorate of Aircraft, wrote a memo to Milt Watkins (Air Force Staff Judge Advocates Office) discussing the investigation. [#160, Ex. 11, AF-FOIA 1926-1927]. In the memo, he noted a recommendation had been made for a fact-based suspension of Boeing because of evidence of the commission of fraud in connection with performing the contract. He stated:

2. There were several instances of misconduct sited [sic] in your letter, with the main complaint being noncompliance of quality assurance requirements relating to work on a fire damaged aircraft. An over and above material CLIN 4010AG was established for the purchase of materials and parts that were not available through the COMBS, but were required for AOG repairs. The over and above material CLIN does not have the same quality requirements as the cost reimbursable material CLINs that are utilized for COMBS stock buys.

3. According to the ACO, parts and materials needed for the repair of this fire damaged aircraft were purchased under CLIN 4010AG, thereby negating the requirement for COCs. When it came to the attention of Boeing that some employees had falsified documents, punitive action was taken to dismiss the COMBS manager and delay promotions and raises for other employees.

4. In summation, the contract did not require the documents that were falsified and action was taken by Boeing to prevent reoccurrence. The overall support

furnished under the contract has been very satisfactory with this incident being isolated and unlikely to recur. It is our recommendation that the debarment package be closed and no action be taken on the remedies plan.

[*Id.*].

24. Prior to December 27, 1994, the OSI closed its investigation of the matter. [#138, Defendant's Statement of Fact ¶24 and Ex. 18, Shaw Memo dated 12/27/94].

25. In a memo from Major Thomas K. Fellion, Command Acquisition Advisor, to S.A. Senness dated August 8, 1995, Fellion set out his office's interpretation of applicable contract provisions and policies concerning whether COCs were required on the parts for the repair of the fire-damaged aircraft. [#166, Boeing's Reply Brief, Ex. 1].

A review of the "solicitation, contract, and DOD FAR Supplement (DFARS) 252.77, Over and Above Work, indicated that contract line      item 4010, subline items 4010AA-AF were within the scope of the original contract. It appears that subline item 4010AG was added to the contract line later but is considered within scope....I phoned the office of primary responsibility (OPR) at the Office of the Assistant Secretary (Acquisition) (SAF/AQ) to confirm my interpretation of the policy. 8 AUG 95 received a telecon from Lt. Col. Ken Truesdale, OPER, SAF/AQCS. Col. Truesdale said "he was in agreement with his boss, if in fact it is within scope of contract and the contract currently requires certificates of compliance (COC), then the over and above is also required to comply with the COC requirements". The ACO in reference A, paragraph 2, sentence 2, states "An over and above material CLIN 4010AG was established for the purchase of materials and parts that were not available through COMBS, but were required for AOG repairs." Subline item 4010AG was established to cover acquisition of AOG emergency parts. From the original contract review it appears that the contract does not distinguish between the COC requirements on parts and materials available through "COMBS" or "COMBS stock  buys" and those parts and materials purchased for AOG use.

[#166, Ex. 1, Memo from Fellion to Senness, 8/8/95]. The memo went on to state:

A Boeing Aerospace Operations letter 22 OCT 92, ref. W-7710-92JS-233, from their E-4B CLS Program Manager to Gary Hartwell, E-4 Systems Program Manager, OC-ALC/LAAM, disclosed that Boeing knew that COCs were a contract

requirement even for AOG[3] parts and materials use. "[F]or the fire damage repair (excluding fastener part numbers), we have assembled the certificates of conformance", and "we were not able to locate a certificate for Part No. AN816-4J-a Nipple."

[*Id.*].

26. On March 14, 1996, U.S. Attorney Monaghan wrote a letter to Milton Watkins of the Air Force Staff Judge Advocate's office, citing Air Force documents that his office had received which indicated that COCs were not, in fact, required for parts used in the repair of the damaged E-4. [#138, Defendant's Statement of Fact ¶22 and Ex. 16, Letter from Monaghan to Watkins dated 3/14/95]. Monaghan noted that these documents contradicted previous assurances from the Air Force that COCs were required, and he asked that the Air Force clarify its position on the issue. [*Id.*].

27. After reviewing the pertinent contract provisions and discussing the issue with Air Force personnel, Watkins informed Monaghan by Memorandum dated 25 March 1995 that the "Air Force's current official position" was that the COC's at issue here were not required by the contract." [#138, Defendant's Statement of Fact ¶23 and Ex. 17, Memo from Watkins to Monaghan dated 3/28/95 at AFOSI 000601].

28. On February 6, 1996, Monaghan sent a letter to the Air Force Office of General Counsel, in which he stated that he was declining both the criminal and civil cases against Boeing, "but only after a considerable waste of resources by both the Departments of Defense and Justice." [#138, Defendant's Statement of Fact ¶26 and Ex. 10, Monaghan Letter to Kathryn Burke, AFOSI 000638.]. The letter sharply criticized the Air Force for its failure to rectify an

---

[3]Counsel for Boeing informed the Court at oral argument that "AOG" means aircraft on ground, and refers to parts necessary for an aircraft to take off.

internal conflict about the Air Force's interpretation of its own procurement contract. [*Id.*].  He

commented:

> This conflict has had an obviously devastating effect on the prospects of both the criminal and civil cases in this office.  I am declining both cases but only after a considerable waste of resources by both the Departments of Defense and Justice.  Additionally, Boeing spent significant time investigating our claims which resulted in serious settlement negotiations.  You might imagine our embarrassment as we still did not know the official Air Force position on whether Certificates of Compliance (COC) are required.

[*Id.*].  He requested to be notified of what procedures, if any, were currently in effect to make

contract provision determinations by the Air Force in criminal or civil procurement litigation

matters, and concluded:

> It is clear that the important task of procurement fraud litigation on behalf of the Air Force, both criminal and civil, cannot be accomplished without a standard, accurate system of procurement contract interpretation.  Please give this matter your immediate attention and please advise as soon as possible.

[*Id.* at AFOSI 000639].

## II.  Analysis

Federal courts are courts of limited jurisdiction.  Jurisdiction is thus presumed not to exist

absent proof by the party asserting jurisdiction.  *United States ex rel. Precision Co. v. Koch*

*Indus., Inc.,* 971 F.2d 548, 551 (10th Cir. 1992), *cert. denied,* 507 U.S. 951 (1993).

In a False Claims Act suit, "[s]atisfaction of the provisions of 31 U.S.C. §3730(e)(4) is a

question of subject matter jurisdiction."  *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99

F.3d 1000, 1003 (10th Cir. 1996).  The Relator has the burden of "alleging facts essential to show

jurisdiction under the False Claims Act as well as supporting those allegations by competent

proof." *Id.* at 1004.

The False Claims Act imposes jurisdictional requirements for private *qui tam* suits.

Specifically, the version of 31 U.S.C. §3730(e)(4) in effect at the time this suit was filed provides:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.[4]

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Where, as here, the jurisdictional question of whether a "public disclosure" has occurred

arises out of the same statute that creates the cause of action, this 'intertwined' jurisdictional

---

[4]In 2010, this provision was amended to state:

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions are alleged in the action or claim were publicly disclosed–

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

> (iii) from the news media,

> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. §3730(e)(4) (2010). The change codifies prior judicial interpretations of the term "based upon." *See United States ex rel. Boothe v. Sun Healthcare Group, Inc.,* 496 F.3d 1169, 1173-74 (10th Cir. 2007), *infra.* The Supreme Court has held the amendment does not apply retroactively, at least in some circumstances. *See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson,* – U.S. –, 30 S.Ct. 1396, 1400 n. 1 (2010). Boeing contends the amendment would not alter the outcome of this case even if it were applicable here; plaintiff does not dispute this.

inquiry is properly resolved on a motion for summary judgment. *See United States ex rel. Holmes v. Consumer Insurance Group,* 318 F.3d 1199, 1203 (10th Cir. 2003).

The jurisdictional inquiry under 31 U.S.C. §3730(e)(4) (A) involves four questions:

(1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources;

(2) whether the alleged disclosure has been made "public" within the meaning of the FCA;

(3) whether the relator's complaint is "based upon" this "public disclosure"; and if so,

(4) whether the relator qualifies as an original source" under §3730(e)(4)(B).

*Holmes,* 318 F.3d at 1203.[5] The idea behind the preexisting public disclosure provision is that, "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *United States ex rel. Boothe v. Sun Healthcare Group, Inc.,* 496 F.3d 1169, 1173 (10th Cir. 2007).

### (1) Whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources

The first prong of the jurisdictional test examines whether the prior disclosure contains allegations from one of the sources listed in §3730(e)(4)(A)–a criminal, civil or administrative hearing; a congressional, administrative or GAO report, hearing, audit, or investigation; or the news media.

Boeing contends the investigation of the 1992 repairs on the fire-damaged E-4 aircraft,

---

[5]"A court must address the purported public disclosure before analyzing whether the relator is an original source. If the answer to any of the first three questions is 'no,' the inquiry is complete and section 3730(e)(4) does not bar the relator's complaint. But if each of the first three questions is answered 'yes,' then the court must consider whether the relator qualifies as an 'original source' under section 3730(e)(4)(B)." *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1004 (10th Cir. 1996).

made by the Air Force Office of Special Investigations clearly constitutes an administrative investigation for purposes of the statute.

Plaintiff does not contest this prong.

### (2) whether the alleged disclosure has been made "public" within the meaning of the FCA

A "public disclosure" occurs "when the allegations of fraud or fraudulent transactions upon which the *qui tam* suit is based are affirmatively disclosed to members of the public who are otherwise strangers to the fraud." *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1005 (10th Cir. 1996). "Public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof." *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F. 3d 1614, 1519 (10th Cir. 1996). "[I]t is not necessary that the information concerning allegations be potentially accessible to any member of the public, only that it be accessible to some members of the public, in order to be considered publicly disclosed within the meaning of 31 U.S.C.A. §3730(e)(4)(A)." *United States ex rel. Baker v. Community Health Systems, Inc.,* 709 F.Supp. 2d 1084, 1097 (D. N.M. 2010) citing *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318 (2d Cir. 1992). Regardless of the number of people a disclosure may have reached, the disclosure of allegations to even one member of the general public who was previously unconnected with the alleged fraud is considered to be "public disclosure." *See Fine v. Advanced Sciences, Inc.,* 99 F.3d at 1005.

Boeing contends public disclosures were made to the U.S. Attorney and to employees of third parties and/or to "innocent" Boeing employees.

### a. U.S. Attorney

Disclosure of information to a competent public official about an alleged false claim

against the government is "public disclosure" within the meaning of §3730(e)(4)(A) when the official is "authorized to act for or to represent the community on behalf of government." *United States ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853, 861 (7th Cir. 1999). "The point of public disclosure of a false claim against the government is to bring it to the attention of the authorities, not merely to educate and enlighten the public at large about the dangers of misappropriation of their tax money." *Id.*

Plaintiff asserts disclosure of information by the OSI to the U.S. Attorney was not "public disclosure" because it was made "from one government employee (the AFOSI or DCIS investigators) to another government employee, both of whom were involved in the investigation." [#160 at 30-31].[6] There is no evidence, however, that the U.S. Attorney's office

---

[6]Plaintiff cites *Seal 1 v. Seal A,* 255 F.3d 1154 (9th Cir. 2001), *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512 (9th Cir. 1995), *MK-Ferguson* and *Ramseyer* in support of this position. Neither *Seal* nor *Schumer* involve disclosure from one government employee to another. However, both decisions mention *Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1419 (9th Cir. 1991) for the proposition that disclosure by one government employee to another would not constitute public disclosure. *See Seal,* 255 F.3d at 1161; *Schumer,* 63 F.3d at 1518. *Hagood* involved an FCA action brought by an assistant district counsel to the San Francisco District of the Army Corps of Engineers assigned to represent the Corps in renegotiation of a water supply contract with the Sonoma County Water Agency. 929 F.2d at 1417. After reviewing the proposed contract, Hagood came to the conclusion that the new contract did not comply with the terms of the 1958 Water Supply Act, 43 U.S.C. §390b, because the Agency's repayment obligations would be substantially reduced by the cost allocations in the proposed contract. *Id.* Hagood put his legal objections to the contract in writing in a letter addressed to the Corps' district engineer and contracting officer. His own boss, the district counsel, responded with a memorandum disagreeing with Hagood's position. *Id.* The Corps proceeded to enter into the contract. *Id.* at 1418. Hagood (who got himself transferred to a Corps job in Alaska) brought his FCA suit against the Water Agency. The district court dismissed the case for lack of jurisdiction, and Hagood appealed. On appeal, the United States filed an amicus curiae brief asserting that when Hagood became involved in preparation of the disputed contract, he was engaged in an "administrative investigation." *Id.* at 1419. The United States conceded no "public disclosure" had occurred when he voiced his objections to the contract to the Corps' district engineer and district counsel. *Id.* However, it asserted that Hagood as a government employee had "disclosed" the information to himself as a

was part of the investigation conducted by the Air Force Office of Special Investigations.

Plaintiff also asserts the U.S. Attorney was an "agent" for the OSI. [#160 at 30 and at 31, n. 11].

However, he cites no legal support for this proposition.[7]

When OSI disclosed its allegations regarding Boeing's conduct to the U.S. Attorney and

his assistants, it was obviously in an attempt to persuade the U.S. Attorney to bring charges

---

member of the public and therefore "public disclosure" had occurred. *Id.* The appellate court, in rejecting this argument, commented, "The notion that we should subdivide Hagood into his governmental self and his nongovernmental self is too metaphysical a contention for the interpretation of a plain congressional enactment." *Id.* Here, disclosures were made by Air Force investigators to the U.S. Attorney and his assistant U.S. attorneys. Thus, *Hagood* is inapposite.

In *Ramseyer,* the court held no public disclosure occurred when a report compiled by an agency employee in his official capacity was seen by other employees within the agency. 90 F.3d at 1521. "Rather, public disclosure occurs only when the allegations of fraudulent transactions are affirmatively provided to others not previously informed thereof." *Id.,* citing *Doe v. John Doe Corp.,* 960 F.2d at 323.

Finally, in *MK-Ferguson,* the Tenth Circuit upheld the district court's determination that the U.S. Department of Energy's disclosure to the State of Oregon of a report and audit concerning alleged fraud by MK-Ferguson in its performance of contracts and projects with DOE constituted "public disclosure." 99 F.3d at 1545. In so ruling, the court noted Oregon was not a party to the contracts or projects, and DOE had placed no restrictions on its dissemination after Oregon's receipt. *Id.* Here, as in *MK-Ferguson,* the U.S. Attorney for the District of Nebraska was not a party to the CLS or the "over and above material CLIN 4010 AG," and there is no indication in the record on summary judgment the U.S. Attorney was not free to use the knowledge and information he obtained in order to prosecute substantially similar fraud.

[7] Citing *Berger v. United States,* 295 U.S. 78, 88 (1935), Boeing argues that the mere fact that the U.S. Attorney may act to vindicate the rights of the Air Force does not make him an "agent" of the Air Force, any more than the U.S. Attorney is an "agent" of any other alleged victim of a federal crime. In *Berger,* the Supreme Court, in chastising a federal prosecutor for statements he made during closing arguments in a criminal case, stated, "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.*

against Boeing and some of its employees. This, along with the fact that OSI and the U.S. Attorney's office are separate agencies, supports a conclusion that a public disclosure within the meaning of the FCA occurred.

**b. Disclosures to Employees of Third Parties and Innocent Employees of Boeing**

During its investigation, the OSI interviewed 26 people, only seven of whom were identified as possible wrongdoers. Boeing contends that "based on the investigative notes produced by the OSI in this case, it is apparent that some of these individuals were not even aware of the purported scheme until they participated in the OSI interview process." [#138 at 17]. Boeing asserts a "public disclosure" took place with respect to all of the witnesses except those who were identified as possible wrongdoers, because they met the criteria established by the Tenth Circuit, i.e., (1) they were "previously unconnected with the alleged fraud," *Holmes,* 318 F.3d at 1206, n.5; and (2) the individual is under no obligation to keep the allegations confidential. *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,* 540 F.3d 1180, 1185 (10th Cir. 2008).

A *qui tam* relator bears the ultimate burden of proving facts essential to show jurisdiction under the FCA, and the Tenth Circuit has placed the burden on the relator to prove the criteria for the public disclosure bar are not met. *See, e.g., United States ex rel. Fine v. M-K Ferguson Co.,* 99 F.3d 1538, 1545 (10th Cir. 1996) (finding that public disclosure had occurred where Department of Energy sent final report and audit to the State of Oregon with cover letter that contained no restrictions on its dissemination or public availability, and the relator had "come forward with no evidence to indicate there was any limitation on Oregon's releasing the final report and audit to the public."). Applying these principals, it is clear that *at least* one public

disclosure took place when investigators interviewed Vanis and Russo, the former Pride employees, because Russo was a stranger to the alleged fraud. Further, there is no evidence any of the innocent Boeing employees were under any obligation to keep information disclosed to them confidential. Therefore, the court concludes public disclosure to innocent witnesses occurred.

### (3) Whether the relator's complaint is "based upon" this "public disclosure"

Under Tenth Circuit law, the term "based upon" in 31 U.S.C. §3730(e)(4)(A) means "supported by." *Kennard v. Comstock Resources, Inc.,* 363 F.3d 1039, 1044 (10th Cir. 2004); *Fine v. Advanced Sciences,* 99 F.3d at 1006; *Boothe,* 496 F.3d at 1173-74. "A relator need not have learned of the basis for the *qui tam* action from the public disclosure for its action to be considered based upon that public disclosure if the allegations are substantially similar." *Kennard,* 363 F.3d at 1044, citing *Fine v. Advanced Sciences, Inc.,* 99 F.3d at 1006 n. 4 (10th Cir. 1996). "The court must determine whether 'substantial identity' exists between the publicly disclosed allegations or transactions and the *qui tam* complaint." *Fine v. Advanced Sciences, Inc.,* 99 F.3d at 1006, citing *Precision,* 971 F.2d at 553. "Moreover, the False Claims Act bars any *qui tam* action that is even partly based upon the publicly disclosed allegations or transactions." *Fine v. Advanced Sciences, Inc.,* 99 F.3d at 1006, citing *Precision,* at 552.

The Tenth Circuit has found, applying the "substantial similarity" standard, that a relator's claim was jurisdictionally barred even though it alleged fraud that differed in "time, place and manner" from the fraud alleged in a prior public disclosure. *Boothe,* 496 F.3d at 11 It has also concluded that "substantial similarity" existed between a relator's allegations and prior public disclosures where the earlier disclosures were sufficient merely to put the government "on notice"

of the defendant's "potential" for future fraudulent conduct. *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568, 572 (10th Cir. 1995). In *Sandia,* the relator claimed a government contractor, Sandia, had defrauded the government by assessing a 2.5% "tax" against nuclear waste funds. Relying on prior public disclosures showing that two of Sandia's eight sister labs had "taxed" such funds in the past with the acquiescence of the DOE, the Tenth Circuit concluded that the government had been "sufficiently alerted...to the likelihood that Sandia would also 'tax' nuclear waste funds in the future." *Id.* at 571. The court held that the prior disclosures need only "set the government squarely on the trail of the alleged fraud without [the relator's] assistance." *Id.* If they did, then "it would be contrary to the purposes of the FCA to exercise jurisdiction over [the relator's] claim." *Id.*

Here, the record clearly establishes that while allegations concerning the repairs of the fire-damaged aircraft prompted the 1992 investigation, the investigation itself examined the requirements of the CLS contract and revealed pre-existing and ongoing issues related to Boeing's compliance with quality assurance and FAA approved parts requirements. Specifically:

- A Report of Investigation dated March 4, 1994 stated that interviews of 11 Boeing employees who had been given immunity disclosed that Boeing had experienced problems with QA for years, which had been continually "upchanneled" to Boeing "well before the repairs of the aircraft." [#138, Ex. 4];

- Another investigation report stated that the initial review of documents seized from the Boeing field unit on Offutt Air Force Base disclosed 55 pages of parts installed on the aircraft and, at the time, it was unknown which parts were in question. Eventually the chief investigator, Holseth, was able to narrow the suspected parts list down to two pages of questionable parts placed on the fire damaged E-4B. The report stated, "A contract file review was completed on the E-4B contract which disclosed Boeing is to use authorized vendors for purchasing parts. If Boeing goes outside these vendors, they are to receive a COC from the manufacturer stating the parts comply with all specifications. (The parts under question were with vendors who are not FAA certified)." [#138, Ex. 7].

- Holseth, in the undated memorandum, outlined four "areas of [alleged] criminality" in the case: the falsification of the COCs, the destruction of documents by Boeing employees after the initial search by the OSI; the certification by another Boeing employee that it had all certificates but one, when many were missing and/or falsified; and the false claim filed in December 1992. Holseth stated, "Also, this has been going on for longer than the repairs, it has been going on for years. Boeing's own quality assurance inspector has been telling Boeing in Oklahoma City about the problems for years, they just decided to ignore it." [Hearing Ex. 1].

- In an August 8, 1995 memorandum for the Air Force Office of Special Investigations on the stated subject of "Addendum to Contract Review," Command Acquisition Advisor Thomas K. Fellion stated that contract line item pursuant to which the repairs on the fire damaged aircraft were performed "was added to the contract line later but is considered within scope"of the original contract; that if "the contract currently requires certificates of compliance (COC), then the over and above is also required to comply with the COC requirements" and that "Boeing knew that COCs were a contract requirement even for AOG parts and material use" and in correspondence had stated, "for the fire damage repair (excluding fastener part numbers), we have assembled the certificates of conformance" and "we were not able to locate a certificate for Part No. AN816-4J-a Nipple." Fellion concluded, "Based on the above, the conclusion of the original contract review stands, the COCs are required." [#166, Ex. 1]. It was therefore the position of one segment of the Air Force that the base contract applying to Boeing's maintenance of all four E-4B's required COCs.

- In the Certificate of Completion submitted by Boeing at the conclusion of the repairs to the fire damaged aircraft, Boeing stated that "all effort associated with Invoice 92AE069, dated 12/21/92 accomplished under CLIN 4010, Contract F34601-86-C-0953, Option 4" had been completed in accordance with the Statement of Work and the supplies or services "are of the quality specified and conform in all respects with the contract requirements..." [#168, Ex. 2].

- In the April 5, 1993 Report of Investigative Activity, Holseth reported that contract administrators had given her a copy of the Amendment of Solicitation/Modification of Contract, which did not say anything about the amendment pertaining to repairs on the fire-damaged aircraft changing the QA requirements from the basic contract. [#160, Ex. 6].

- A letter dated 28 March 1995 from Milton D. Watkins, Chief, Acquisition Law Services Division in the Office of the Staff Judge Advocate, to U.S. Attorney Thomas J. Monaghan, in which he attempted to answer questions posed by Monaghan, stated that he was the proper person to make the determination of whether COCs were required under CLIN 4010-AG, that after discussions with

various Air Force personnel, he had issued an opinion dated March 31, 1994, that the COCs "at issue here" were not required by the contract, and that his March 31, 1994 opinion "is the Air Force's current official position on whether COCs were required." [#138, Ex. 17].

The record clearly establishes that, regardless of the *outcome* of the investigation, one of the two factions involved in the internal Air Force conflict believed that compliance with QA and the COC requirements *was* required by the CLS contract in Boeing's performance under the contract addendum for repairs to the fire damaged aircraft; further, they believed Boeing had violated these requirements. More importantly, the investigation revealed alleged fraud with respect to QA and COC compliance which was *not* confined to the repairs of the fire damaged aircraft, but rather had been "going on for years" in the performance of the CLS contract for the E4B aircraft. [Hearing Ex. 1]. The government, as a result of the 1992 investigation, knew the alleged fraud in the QA and COC compliance was an ongoing rather than an isolated problem, and this knowledge was sufficient to put it "on notice" for future fraudulent conduct. *See Sandia Corp.,* 70 F.3d at 572 .[8]

The Court concludes the allegations of the Relator in this case are "substantially similar"

---

[8]Plaintiff, citing the Tenth Circuit's holding in *Maxwell,* 540 F.3d at 1187, asserts his action is not "based upon" information disclosed in the prior investigation. In *Maxwell,* defendant Kerr McGee argued a *qui tam* plaintiff's FCA suit for alleged fraudulent underpayment of sales proceeds and accompanying underpayment of royalties on more than 50 offshore federal leases, was barred because it was based on information publicly disclosed in the course of the litigation and settlement of *United States ex rel. Johnson v. Shell Oil Co.,* 33 F.Supp.2d 528 (E.D. Tex. 1999). The Tenth Circuit stated, "Although we have held that a subsequent lawsuit can be 'based upon' allegations made in a prior lawsuit even when the two suits cover different periods of time, the 'essential claim[s]' must be substantially 'similar.' 540 F.3d at 1187. The court found that the publicly filed documents in the *Johnson* case did not involve the contract at issue in *Maxwell* and the general allegation in *Johnson* that Kerr-McGee was involved in fraudulent underpayment of royalties was not itself "enough information to discover related frauds" *Id.* This case, however, involves the same CLS contract involved in the 1992-1996 investigation, and the same alleged practice of defrauding the government in QA and COC compliance.

to the revelations of alleged fraud by Boeing during the earlier investigation. Thus, the Relator's claims are "based upon" the public disclosures made in the 1992-1996 investigation.

**(4) Whether the relator qualifies as an "original source" under §3730(e)(4)(B)**

If the present action was "based upon" the public disclosures of allegations in the1992-1996 investigation, the court would only have jurisdiction if plaintiff establishes his wife was an "original source" of the information disclosed in the earlier investigation. Plaintiff concedes that since Teresa Lancaster did not begin working for Boeing until 1996, she could not be an "original source" of the public disclosures made in the 1992-1996 investigation.

### III. Conclusion

For the foregoing reasons, Boeing's Motion for [partial] Summary Judgment [#138] is granted.[9]

ENTERED this 11th day of March, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

[9]Plaintiff's claim for constructive discharge remains pending. This matter is therefore set for a conference on the 31st day of March, 2011, at 9:30 a.m. to set this matter for a final pretrial conference and jury trial.